## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**CHARLES FITZPATRICK,**

           **Plaintiff,**

**v.**                                       **Case No. 20-CV-01218-SPM**

**WEXFORD HEALTH
SOURCES, INC., et al.,**

           **Defendants.**

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Pending before the Court are two Motions for Summary Judgment—one filed by Defendants Wexford Health Sources, Inc.; Mohammed Siddiqui, M.D.; Alisa Dearmond; Michael Moldenhauer; and Mary Jo Zimmer (Doc. 88) and the second filed by Defendants Rob Jeffreys and Anthony Wills (Doc. 91). *Pro se* Plaintiff Charles Fitzpatrick filed a Response. (Doc. 94). Having been fully informed of the issues presented, this Court **GRANTS** both Motions for Summary Judgment.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

*Pro se* Plaintiff Charles Fitzpatrick is an inmate presently incarcerated at Menard Correctional Center in Menard, Illinois. (*See* Doc. 1). The instant case arises from treatment Fitzpatrick received for an abdominal lump (later determined to be abdominal wall pain) while at Menard. (*See id.*). Fitzpatrick filed the instant lawsuit on November 9, 2020. (*See id.*). This Court conducted preliminary review of Fitzpatrick's Complaint pursuant to 28 U.S.C. § 1915A on September 27, 2021. (Doc.

11). The Court consolidated Fitzpatrick's claims as follows: (1) a claim that he was denied adequate medical care by Defendants Dr. Siddiqui; Nurse Practitioners Deamond, Moldenhauer, and Zimmer; and Healthcare Unit Administrator Crain[1] and that Defendants Jeffreys (the Director of the Illinois Department of Corrections) and Wills (the Warden at Menard) failed to intervene in violation of the Eighth Amendment (Doc. 11, p. 5 (citing Doc. 1, pp. 13–15)); (2) that Defendant Wexford's alleged cost-saving practices resulted in his abdominal lump and associated pain being improperly treated (*Id.*, p. 6); and (3) that Defendants Jeffreys and Wills "knew that the healthcare unit was understaffed through grievances he filed and filed by other inmates and 'deliberately turned a blind eye.'" (*Id.* (citing Doc. 1, p. 12)).

Defendants Wexford, Siddiqui, Dearmond, Moldenhauer, and Zimmer filed a Motion for Summary Judgment on March 24, 2022 (Doc. 46); Defendants Jeffreys, Wills, and Crain filed a separate Motion for Summary Judgment on April 25, 2022 (Doc. 53). The Court denied both motions on October 28, 2022. (*See* Doc. 63). The Court held a *Pavey* hearing on January 19, 2023 (*see* Doc. 69) and determined on June 29, 2023 that Fitzpatrick had exhausted his administrative remedies against all of the Defendants with the exception of Defendant Crain; Fitzpatrick's claims against her were dismissed with prejudice. (*See* Doc. 75). Each group of Defendants filed a Motion for Summary Judgment on June 6, 2024. (*See* Docs. 88, 91). Fitzpatrick responded on July 31, 2024. (*See* Doc. 94). Defendants Wexford, Siddiqui, Deamond, Moldenhauer, and Zimmer filed a Reply on August 14, 2024. (*See* Doc. 95).

---

[1] The Court dismissed Fitzpatrick's claims against two unnamed individuals on October 28, 2022 for failure to file a motion to substitute their actual names by the Court's deadlines. (*See* Doc. 63).

## APPLICABLE LAW AND LEGAL STANDARDS

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Stated another way, the nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) *(*citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640–41 (7th Cir. 2008) (quoting *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008)). The non-movant cannot simply rely on its pleadings; the non-movant must present admissible evidence that sufficiently shows the existence of each element of its case on which it will bear the burden of proof at trial. *Midwest Imps., Ltd. v. Coval*, 71

F.3d 1311, 1317 (7th Cir. 1995) (citing *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 394 (7th Cir. 1993), *cert. denied*, 510 U.S. 1111 (1994); *Celotex*, 477 U.S. at 323–24).

ANALYSIS

The Eighth Amendment prohibits cruel and unusual punishment and deliberate indifference to the "serious medical needs of a prisoner [which] constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citation omitted). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

Claims for deliberate indifference have an objective and a subjective component. *Estelle v. Gamble*, 429 U.S. 97 (1976). Fitzpatrick must establish that he suffered from an objectively and sufficiently serious medical condition. *Cesal v. Moats,* 851 F.3d 714, 721 (7th Cir. 2017). He must also show that the Defendants actually knew of, but disregarded, a substantial risk to the inmate's health. *Cesal,* 851 F.3d at 721. "Intentional delays in medical care may constitute deliberate indifference, even if the inmate's medical condition is non-life threatening." *Id.* at 722 (quoting *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011)). "A doctor's choice of 'easier and less efficacious treatment' for an objectively serious medical condition also may be sufficient . . . [,] [b]ut 'mere disagreement with a doctor's medical judgment' is not enough to support an Eighth Amendment violation." *Id.* (first quoting *Estelle*,

429 U.S. at 104 & n.10; then quoting *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010)).

Additionally, it is well-settled that mere negligence is not enough to establish a Defendant's deliberate indifference. *See, e.g.*, *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986). In fact, even gross negligence is insufficient. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Instead, deliberate indifference is comparable to criminal recklessness. *Thomas v. Blackard,* 2 F.4th 716 (7th Cir. 2021) (citing *King*, 680 F.3d at 1018). "'Reckless' describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred." *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002) (quoting *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources*, Inc., 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (quoting *Zaya v. Sood,* 836 F.3d 800, 805–06 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant knew better than to make the medical decision that [he] did." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (cleaned up). A medical professional's choice of an "easier and less

efficacious treatment" can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *Berry,* 604 F.3d at 441 (quoting *Estelle*, 429 U.S. at 104 & n.10). The Seventh Circuit has "characterized the standard as imposing a high hurdle on plaintiffs because it requires a 'showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (quoting *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006)).

The first question before the Court is whether Fitzpatrick's abdominal lump qualified as a "serious" medical condition. Fitzpatrick argues that it was (*see* Doc. 1, p. 7) and Defendants Jeffreys and Wills argue that his abdominal lump and associated pain were not "life-threatening" and "did not constitute a substantial risk to the Plaintiff's safety or represent injuries for which failure to treat could result in further significant injury to Plaintiff." (Doc. 91, pp. 13–14 (quoting *id.*, ¶ 9)).

First, "the Supreme Court contemplated that medical conditions far less critical than 'life-threatening' would be encompassed by the term." *Gutierrez* at 1370. "Indeed, the inmate in *Estelle* based his medical care claim 'solely on the lack of diagnosis and inadequate treatment of his back injury,' which had been diagnosed by prison doctors as a lower back strain and treated with muscle relaxants and pain medication." *Id.* at 1370–71 (quoting *Estelle* at 107). The Seventh Circuit concluded in *Gutierrez* that an infected pilonidal cyst was a sufficiently "serious" medical need, like the back injury in *Estelle*; injuries from an assault by prison guards in *Cooper v. Casey*, 97 F.3d 914, 917–17 (7th Cir. 1996); and psychological treatment in *Antonelli*

*v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996). *See Gutierrez* at 1371–72. However, the Seventh Circuit put common colds, toes with removed toenails, and mild asthma as being outside the ambit of "serious" medical needs. *See id.* at 1372 (citing *Gibson v. McEvers*, 631 F.2d 95 (7th Cir. 1980); *Snipes v. DeTella*, 95 F.3d 586, 591 n.1 (7th Cir. 1996), *cert. denied*, 519 U.S. 1126 (1997); *Oliver v. Deen*, 77 F.3d 156 (7th Cir. 1996)).

With all of the above in mind, the Seventh Circuit noted that "[i]t is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' at the pleading stage." *Id.* at 1372. Notably, *Gutierrez* involved a suit dismissed at the pleadings, not a case at the point of summary judgment as in the instant case. The Seventh Circuit has "recognized that 'a hernia can be an objectively serious medical problem' and that for some hernias, the 'chronic pain presents a separate objectively serious condition.'" *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 521 (7th Cir. 2019) (quoting *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011)). While a hernia was eventually ruled out as the cause of Fitzpatrick's pain, he does describe the abdominal lump as being painful. (*See* Docs. 1, 94). Because Fitzpatrick's lump caused him "excruciating pain" (Doc. 94, p. 18) and required various treatments as well as diagnostic labs and imaging, the Court holds that Fitzpatrick's abdominal lump was a sufficiently serious medical need in line with the first prong of the deliberate indifference standard. *See Cesal,* 851 F.3d at 721.

**I. Defendants Siddiqui, Dearmond, Moldenhauer, and Zimmer**

We then move to the question of whether each of the medical provider Defendants were deliberately indifferent to Fitzpatrick's abdominal lump. In *Cesal*, the Seventh Circuit found that a prison physician was not deliberately indifferent to an inmate's back injury because there was not "any reason in this record to think that starting with the physician assistant and nurse was not a reasonable step." *Id.* at 723. While Fitzpatrick argues that there were significant delays in his treatment, the Seventh Circuit has stated that "[o]ne thing which has long been clear in our Eighth Amendment cases is that the amendment is not coterminous with a medical malpractice claim." *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997) (citing *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996); *Oliver v. Deen*, 77 F.3d 156 (7th Cir. 1996); *Snipes v. DeTella*, 95 F.3d 586 (7th Cir. 1996), *cert. denied*, 519 U.S. 1126 (1997)). Additionally, prisoners are "not entitled to the best care possible" but rather "to reasonable measures to meet a substantial risk of serious harm to her." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). When a prisoner sought "specific treatment and foolproof protection from infection," the Seventh Circuit stated that "[t]he Eight [sic] Amendment does not provide her with either." *Forbes*, 112 F.3d at 266.

Fitzpatrick began experiencing what he describes as a painful lump on the left side of his abdomen while making noodles at a sink in October 2019; he first sought treatment for it at sick call on November 15, 2019 and was prescribed antacid tablets. (*See* Doc. 89, Ex. C, p. 1; Doc. 91, ¶ 7 (citing Doc. 91, Ex. A, 27:19–28:7; 29:9–15; 110:4–8)). He was seen again at sick call on March 5, 2020; Fitzpatrick refused both

acetaminophen and ibuprofen for his pain. (*See* Doc. 89, Ex. C, pp. 3–5). On March 26, 2020, he was seen by Defendant Moldenhauer, who prescribed Colace and submitted a collegial review. (*See id.*, Ex. C, p. 5). A request for an ultrasound was sent on April 7, 2020. (*See id.*, Ex. C, p. 6). Fitzpatrick was seen again on April 13 and 14, 2020; it was noted that labs were ordered and that Fitzpatrick had zero pain with palpation of the lump, although he did describe the pain as "excruciating" on April 13. (*id.*, Ex. C, p. 7; *see id.*, Ex. C, pp. 7–8). He was seen again by Defendant Moldenhauer on April 21, 2020, who indicated that Fitzpatrick was awaiting testing. (*See id.*, Ex. C, p. 9). Fitzpatrick was next seen at sick call on May 19, 2020 and it was noted that he was waiting for an x-ray. (*See id.*, Ex. C, pp. 10–11). He was seen by Defendant Siddiqui on May 26, 2020, who noted no indications of a hernia and "no lumps on back or head." (*See id.*, Ex. C, p. 12).

Fitzpatrick had an ultrasound on May 28, 2020 and was seen by Defendant Zimmer later the same day. (*See id.*, Ex. C, p. 13). Fitzpatrick subsequently had a chest x-ray and kidney, ureter, and bladder x-ray on June 18, 2020. (*See id.*, Ex. C, p. 14). Fitzpatrick saw Defendant Dearmond on June 19, 2020 and was informed that none of the imaging indicated that a hernia was present; Defendant Dearmond prescribed "capsaicin cream to apply twice a day as needed for six months" and "400 milligrams of Neurontin to be taken twice daily for six months." (Doc. 89, ¶21; *see id.*, Ex. C, p. 15). Fitzpatrick was next seen by Dr. Reynal Caldwell on July 29, 2020; Dr. Caldwell ordered an upper GI barium test. (*See id.*, Ex. C, p. 16). At collegial review, Fitzpatrick's upper GI barium test was denied and an alternative treatment plan was

adopted including checking Plaintiff's commissary list, a fecal occult blood test, trial H2 blockers, and Bentyl. (*See id.*, Ex. C, p. 17). Fitzpatrick's appointment with Defendant Zimmer on August 25, 2020 was cancelled due to "institutional deadlock." (*See id.*, Ex. C, p. 18). Defendant Moldenhauer next saw Fitzpatrick on September 1, 2020 and discussed the alternative treatment plan, which included "urinalysis ("UA"), comprehensive metabolic panel ("CMP"), complete blood count ("CBC") with a stool occult blood test on three consecutive bowel movements"; Fitzpatrick was prescribed "20 milligrams of Bentyl twice daily and 40 milligrams of Prilosec both for three months." (*Id.*, ¶ 31 (citing *id.*, Ex. C, p. 63; Ex. F, ¶ 7)).

Fitzpatrick saw Defendant Siddiqui on November 11, 2020. (*See id.*, Ex. C, p. 20). Fitzpatrick "reported no nausea or bowel symptoms" and "reported that Bentyl and Prilosec were not effective in treating his symptoms" and "demanded an outside referral." (*Id.*, ¶ 33). "Dr. Siddiqui noted that all testing, including the ultrasound, was normal" and that Plaintiff's abdomen was flat and nontender with no discernable hernia." (*Id.*). "His diagnosis during this encounter was that Plaintiff had nonspecific pain in his abdomen." (*Id.*).

Fitzpatrick was next seen by a nurse on March 27, 2021 and by Defendant Moldenhauer on April 2, 2021. (*See id.*, Ex. C, pp. 21–23). A collegial review was submitted for an abdominal CT scan. (*See id.*, Ex. C, p. 23). The CT scan was performed on May 19, 2021 and "found no acute abnormalities in the abdomen or pelvis and a potential prostatic utricle cyst." (*Id.*, ¶ 36; *see id.*, Ex. C, p. 24). Fitzpatrick had another x-ray on April 11, 2023 and another CT scan on April 28,

2023, both of which showed no abnormalities. (*Id.*, ¶¶ 38–39 (citing Plaintiff's Medical Records Produced by IDOC, Ex. E, pp. 676, 793; Ex. D, ¶¶ 28–29)). An MRI on May 31, 2023 showed "a prostatic utricle cyst and potential scarring or prostatitis." (*Id.*, ¶ 40 (citing Ex. D, ¶ 30; Ex. E, p. 698)). On June 1, 2023, an outside doctor "noted that, given the character of the pain as sharp, transient, and aggravated by movement, as well as the unremarkable labs and CT scan, he was given a diagnosis of abdominal wall pain." (*Id.*, ¶ 42 (citing Ex. A, 78:10–18; Ex. E, pp. 702–05)).

The record is clear that Fitzpatrick was seen numerous times by Nurse Practitioners Dearmond, Moldenhauer, and Zimmer as well as by Dr. Siddiqui. (*See* Doc. 89, pp. 2–8; Doc. 91, pp. 2–7). The medical providers ordered diagnostic imaging to assess Fitzpatrick's abdominal lump, including an ultrasound; kidney, ureter, and bladder x-ray; chest x-ray; CT scans; and an MRI. (*See* Doc. 89, pp. 2–8; Doc. 91, pp. 2–7). They also ordered blood testing and prescribed various medications to treat Fitzpatrick's symptoms. (*See* Doc. 89, pp. 2–8; Doc. 91, pp. 2–7). While Fitzpatrick argues that he was in "constant pain" (Fitzpatrick Dep. 100:13; 103:18–22) and described it as "excruciating" on April 13, 2020 (Doc. 89, Ex. C, p. 7), the pertinent medical documentation states that Fitzpatrick had zero pain with palpation of the lump and it was noted that the paint was "chronic" and "transient," not constant as Fitzpatrick claims. (Doc. 89, ¶ 42 (citing Ex. A, 78:10–18; Ex. E, pp. 702–05)). Additionally, Fitzpatrick refused acetaminophen and ibuprofen when he was offered it for pain management. (*See* Doc. 89, Ex. C, pp. 3–5).

Although Fitzpatrick did file grievances regarding his medical treatment, his grievance from August 26, 2020 (Doc. 1, p. 32) states that he had been having pain since March 2020, not from October 2019 as he indicated in his Deposition. *See* Fitzpatrick Dep. 110:3–8. While Fitzpatrick states in his Deposition that the "whole process is terrible" (*id.* 111:2–3), the medical record indicates that his concerns were acknowledged via numerous sick call visits, imaging, and diagnostic analysis, most of which showed no abnormalities. While Fitzpatrick takes issues with specific delays in his care due to an influenza quarantine and because of delays associated with collegial review, neither of these facts indicate that the medical provider Defendants were deliberately indifferent to his medical needs; instead, Fitzpatrick's medical record showed that the Defendants addressed his concerns through various medications, diagnostics tests, and treatment plans.

Fitzpatrick also argues that the medical provider Defendants intentionally delayed his treatment as a cost-saving measure. (*See* Doc. 1, pp. 4–11; Doc. 94, pp. 6–11). However, he has not provided any evidence that he was denied treatment as a cost-saving measure by any of the medical provider Defendants. *See* Fitzpatrick Dep. 84:23–88:24.

Therefore, construing the evidence in favor of Fitzpatrick, the Court holds that a jury could not find that Defendants Siddiqui, Dearmond, Moldenhauer, or Zimmer were deliberately indifferent to Fitzpatrick's abdominal lump in violation of the Eighth Amendment. For this reason, their Motion for Summary Judgment must be granted.

## II. Defendant Wexford Health Sources, Inc.

The Seventh Circuit has held that "a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." Wilson, 932 F.3d at 521 (quoting *Iskander v. Village of Forrest Park*, 690 F.2d 126, 128 (7th Cir. 1982)). "The plaintiff may try, however, to demonstrate that a private corporation has a company policy or rule that is the 'moving force of the constitutional violation.'" *Id.* (quoting *Iskander* at 128); *see Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). Fitzpatrick argues that Wexford "has a policy to deliberately understaff its Healthcare Unit (HCU) at Menard to save money," that it "has allowed non-medical persons [to] make medical decisions," that "medical staff are allowed to constantly break the rules without consequence or discipline," and that they are aware of these issues because of grievances filed by inmates and because of "the many many many [sic] 1983 lawsuits that have been filed about these medical staff deliberately denying medical care to inmates." (Doc. 1, pp. 4, 8, 9, 10). Fitzpatrick argues that the sick call forms show that Wexford has "a policy in place . . . to give only Tylenol & Ibuprofen for pain to save money even though they know that this does not help with managing the pain or stopping the pain" and that he "made it known that he was in excruciating pain & the medications the Defendants were giving him were not helping to manage or stop his pain." (*Id.*, pp. 13–14). He argues that the prison sick call forms evince "a procedure called standard protocol or standing protocol about the Tylenol, the Ibuprofen." Fitzpatrick Dep. 83:18–20. Fitzpatrick also points to the "civil class action lawsuit *Lippert v. Godinez/Baldwin*

filed in 2010 & believed to be settled in 2019" as evidence of Wexford's deliberate understaffing. (Doc. 94, p. 10).

Wexford argues that "Plaintiff's evidence of the Wexford policy of deliberate understaffing consists of his personal observations as well as vague statements of unidentified nurses." (Doc. 89, p. 15). They also argue that "Plaintiff's evidence of a Wexford policy of giving only Tylenol and Ibuprofen rests solely on the fact that those two medications are listed on the outpatient progress note form" and that "Plaintiff's own medical records reflect that other medications can be written on these forms, and also that Tylenol and Ibuprofen are often not prescribed." (*Id.*, p. 16 (citing *id.*, Ex. C)). Wexford also argues that "Plaintiff presents no evidence of the alleged Wexford policy of considering cost above all else when determining a course of medical treatment" and that Wexford does not have any "policy, protocol, or practice, either written or unwritten, of (1) not adequately training or supervising their medical staff, (2) using the collegial review process to deny medical care, (3) limiting pain medicine to only Tylenol and Ibuprofen, or (4) delaying or cancelling medical appointments at correctional facilities to save money." (*Id.*)

Wexford is correct that Fitzpatrick has provided zero evidence of any unconstitutional policy at Wexford besides personal anecdotes and observations. As Wexford states, "without evidence of an unconstitutional policy[,] Plaintiff's claims as to Wexford must be dismissed." (*Id.*, p. 15 (citing *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014); *Iskander*, 690 F.2d at 128)). Therefore, even considered the evidence in the light most favorable to him, Fitzpatrick has failed to rebut

Wexford's assertion that there is not a genuine dispute of material fact sufficient for his claims against Wexford to be presented to a jury.

### III. Defendants Jeffreys and Wills

### A. Sovereign Immunity

Defendants Jeffreys and Wills first argue that they are entitled to sovereign immunity. (*See* Doc. 91, pp. 9–10). They argue that, because "[a] suit against a State officer in his official capacity is actually against the State," that Fitzpatrick's Eighth Amendment deliberate indifference claims are barred by sovereign immunity. (*Id.*, p. 9 (citing *Wilson v. Quinn*, 2013 IL App. (5th) 120337)). They argue that the factors elucidated in *Shirley v. Harmon*, 405 Ill. App. 3d 86 (2nd Distr. 2010) indicate that sovereign immunity shields both of them in the instant case. (*See* Doc. 91, p. 9 (quoting *Shirley* at 91 ("An action will be considered against the State, and thus, within the exclusive jurisdiction of the Court of Claims, where: "(1) [T]here are no allegations that a state employee acted beyond the scope of his authority through wrongful acts; (2) the employee did not allegedly breach a duty owed to the public generally independent of his state employment; and (3) the complained-of actions involve matters ordinarily within the employee's normal and official functions with the State.")))). Defendants Jeffreys and Wills argue that "there is no allegation in the complaint that either Defendant acted beyond the scope of his authority as the director of the Illinois Department of Corrections (Jeffreys) or warden of Menard (Wills)"; that "the alleged breaches are based upon what Plaintiff believes to be a duty owed specifically to Plaintiff as an inmate at Menard Correctional Center, not the

public generally independent of Defendant's state employment"; and that "the complained-of actions involve matters ordinarily within Defendants' normal and official functions." (*Id.*, p. 10 (citations omitted)). Fitzpatrick does not respond to Defendants Jeffreys's and Wills's sovereign immunity arguments.

The Seventh Circuit has upheld the determinations of district courts that state agencies are not "'persons' amenable to suit under § 1983." *Cullen v. Saddler*, 668 F. App'x 656 (7th Cir. 2016) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir.), *cert. denied*, 577 U.S. 925 (2015) (Mem.); *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2006)). However, while Defendants Jeffreys and Wills argue that Fitzpatrick's claims against them are actually against state agencies, Fitzpatrick is clear that he is suing them as individuals, not merely as a means to attempt to sue state agencies. (*See id.*, p. 9 (citing *Wilson v. Quinn*, 2013 IL App. (5th) 120337); *see also* Docs. 1, 94). As the Seventh Circuit caselaw is clear, the Court holds that sovereign immunity does not bar Fitzpatrick's claims against Defendants Jeffreys and Wills.

## B. Deliberate Indifference

Fitzpatrick brings two separate claims against Defendants Jeffreys and Wills—he argues that the two of them were deliberately indifferent to his treatment by Defendants Siddiqui, Dearmond, Moldenhauer, and Zimmer and that Jeffreys and Wills "deliberately turned a blind eye" to the understaffing in the HCU. (Doc. 1, pp. 12–13). Jeffreys and Wills argue that they were not deliberately indifferent to Fitzpatrick's treatment (*Id.*, pp. 12–18) and that Fitzpatrick's claims about HCU

understaffing must fail because he has not provided any evidence besides his allegation "is based entirely on his impressions and hearsay conversations Plaintiff had with Wexford personnel." (*Id.*, p. 18).

The Seventh Circuit has stated that "[w]e have long recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 50 (Mem.). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005)).

Additionally, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* at 1049–50 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). The Seventh Circuit has repeatedly affirmed district courts' grant of summary judgment "for non-medical prison officials who relied on the professional judgment of prison medical staff." *Id.* at 1050 (citing *Hayes v. Snyder*, 546 F.3d 516, 527–28 (7th Cir. 2008)). In both *Giles* and in *Haynes*, the Seventh Circuit determined that such officials "'were entitled to rely on the professional judgment of medical prison officials'" and "'nothing in [the medical] reports made it obvious that [the inmate] might not be receiving adequate care.'" *Id.* (citing *Hayes* at 527–28). Notably, Giles "was receiving regular medical attention from psychologists,

psychiatrists, and mental health professionals," had emergency appeals that "were reviewed by the ARB, which found his complaints to be without merit upon investigation," and did not "present[] evidence that his grievances were ignored or mishandled." *Id.*

Defendants Jeffreys and Wills insist that Fitzpatrick's grievances are "conclusory statements [that] are not sufficient to satisfy a claim for deliberate indifference." (Doc. 91, p. 12 (citing *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 753 (7th Cir. 2021)). However, *Peterson* involved "conclusory allegations that these defendants had the requisite state of mind" with the plaintiff "stating that they 'ignored the FDA mandated warnings' and 'knew that [Peterson] would suffer personal injuries.'" 986 F.3d at 753. Viewing the evidence in the light most favorable to Fitzpatrick, the Court will assume that Jeffreys and Wills did receive Fitzpatrick's grievances and had notice of his medical care.

However, even assuming that Defendants Jeffreys and Wills were aware of Fitzpatrick's medical treatment, both Defendants were entitled to rely upon the advice and course of treatment conducted by the physicians and medical personnel at Menard. The instant case is analogous to both *Giles* and to *Haynes* because the record shows that the medical staff at Menard addressed Fitzpatrick's abdominal lump on various occasions. (*See* Doc. 89, pp. 2–8; Doc. 91, pp. 2–7). As the Court previously noted, Fitzpatrick's abdominal lump was an objectively serious medical need because it caused him "excruciating pain." (Doc. 1, pp. 13–14; Doc. 89, Ex. C, p. 7; Doc. 94, p. 18). As stated above, a prisoner is entitled to "reasonable measures to meet a

substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). This standard was met here. Regardless of Fitzpatrick's assertions of deliberate indifference, it was reasonable for each of the non-physician Defendants to rely upon the treatment provided by prison medical officials, who continued to prescribe various treatments for Fitzpatrick's abdominal lump and associated pain. (*See* Doc. 89, pp. 2–8; Doc. 91, pp. 2–7). Additionally, while Fitzpatrick argues that Defendants Jeffreys and Wills deliberately restricted his ability to see medical staff because of prison lockdowns, Fitzpatrick admitted in his deposition that Menard is a "high [sic] aggressive prison" and that this "happens quite a lot." Fitzpatrick Dep. 59:3–60:3; (*see* Doc. 91, p. 18 (citing the same)).

Fitzpatrick also claims that Defendants Jeffreys and Wills were aware that the HCU at Menard was "understaffed & inadequately staffed." (Doc. 1, ¶ 20). Defendants Jeffreys and Wills argue that "Plaintiff's allegation is based entirely on his impressions and hearsay conversations Plaintiff had with Wexford personnel." (Doc. 91, p. 18 (citing Doc. 1, ¶ 18)). In his Deposition, Fitzpatrick states that "I've, you know, had a heated argument with certain nurses. Like, sure, I know I have issues and she just trying to say, man, we ain't got enough staff. So same thing with Siddiqui. Siddiqui said it, too, before." Fitzpatrick Dep. 34:15–19; *see id.* 33:5–34:19, 36:16–37:14. Apart from such impressions, Fitzpatrick has provided zero evidence of this understaffing, so his claim here fails, as well.

In conclusion, while Fitzpatrick has adequately argued that his abdominal lump was a "serious" medical condition requiring treatment, Seventh Circuit

precedent indicates that Defendants Jeffreys and Wills were entitled to rely upon the medical judgment of Fitzpatrick's medical treatment team; put another way, they did not disregard a substantial risk to Fitzpatrick's health. *Cesal,* 851 F.3d at 721. Moreover, there is no evidence that any of the Defendants exhibited deliberate indifference to the point of criminal recklessness sufficient to provide them with the scienter required for a deliberate indifference claim.

## C. Qualified Immunity

In the alternative, Defendants Jeffreys and Wills also argue that they are entitled to qualified immunity. (*See* Doc. 91, pp. 19–22). While the Court need not assess Defendants Jeffreys and Wills's qualified immunity argument by virtue of the fact that Fitzpatrick's Eighth Amendment claims do not survive Defendants Jeffreys and Wills's Motion for Summary Judgment (Doc. 91), the Court will briefly discuss the applicability of qualified immunity to the instant facts.

In the alternative to their arguments against each of Fitzpatrick's claims, the Defendants argue that they are entitled to qualified immunity because "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (Doc. 91, p. 19 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). They argue that "the facts alleged here do not give rise to a constitutional violation" and that "[e]ven if Plaintiff disagreed with the care he was provided or felt he should have been treated sooner, this does not rise to the level of a constitutional claim when they did not actually

participate in any aspect of Plaintiff's medical care." (*Id.*, pp. 20–21). Fitzpatrick argues that they are not entitled to qualified immunity because he argues that the Defendants exhibited deliberate indifference toward his pain in violation of the Eighth Amendment. (*See* Doc. 94, p. 19).

"Qualified immunity is an affirmative defense, but once it is raised the burden shifts to the plaintiff to defeat it." *Holleman v. Zatecky*, 951 F.3d 873, 877 (7th Cir. 2020) (citing *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001)). "To overcome qualified immunity, the facts viewed in the light most favorable to [the plaintiff] must 'show that the defendant[s] violated a constitutional right' and that 'the right was clearly established at [that] time.'" *Id.* (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 550 (7th Cir. 2017)).

Regarding Fitzpatrick's Eighth Amendment claim, the Seventh Circuit has established that "[w]hen considering deliberate-indifference claims challenging the medical judgment of prison healthcare personnel, qualified-immunity analysis requires us to frame the legal question with reasonable specificity." *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2019). In *Campbell*, the Seventh Circuit determined that "[t]he proper inquiry is whether then-existing caselaw clearly established a constitutional right to gender-dysphoria treatment beyond hormone therapy" not "that 'denying effective treatment' for Campbell's medical condition violates the Eighth Amendment" because the latter "formulation—which is basically a highly conceptualized version of the deliberate-indifference standard—is far too general." *Id.* at 546. Additionally, "'[f]or purposes of qualified immunity, [the Eighth-

Amendment] duty' to treat prisoners' serious medical conditions 'need not be litigated and then established disease by disease or injury by injury.'" *Id.* at 548 (quoting *Est. of Clark*, 865 F.3d at 553). Moreover, "[w]hen prison officials utterly fail to provide care for a serious medical condition, the constitutional violation is obvious and qualified immunity offers little protection." *Id.* (citing *Orlowski v. Milwaukee County*, 872 F.3d 417, 422 (7th Cir. 2017)).

Here, Fitzpatrick cannot argue that his abdominal lump was not treated at all, which is clearly not the case. His argument, then, must be that prison officials persisted in treatment that was ineffective. *See id.* at 547 (quoting *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (citing *Petties v. Carter*, 836 F.3d 722, 729–30 (7th Cir. 2016), *as amended* (Aug. 25, 2016)). This argument also fails because it has clearly been established that the Defendants treated Fitzpatrick's abdominal lump. Like in *Campbell*, there is no Circuit precedent indicating that the course of care for his abdominal lump violated a constitutional right, meaning the Defendants were not on notice of a constitutional violation and would be entitled to qualified immunity if the Court reached that question.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** both Defendants Defendants Wexford Health Sources, Inc.; Mohammed Siddiqui, M.D.; Alisa Dearmond; Michael Moldenhauer; and Mary Jo Zimmer's Motion for Summary Judgment (Doc. 88) and Defendants Rob Jeffreys and Anthony Wills's Motion for Summary Judgment. (Doc. 91). This case is **DISMISSED with prejudice**. The Clerk

of Court is **DIRECTED** to close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: September 10, 2024**

>                     **/s/ Stephen P. McGlynn**
>                     **STEPHEN P. McGLYNN**
>                     **U.S. District Judge**